**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| JEREMY JAMES LAWLESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16CV498 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social | ) | |
| Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Jeremy James Lawless, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 8 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 10, 12; see also Docket Entry 11 (Plaintiff's Memorandum); Docket Entry 13 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for SSI. (Tr. 190-98.) Upon denial of that application initially (Tr. 84-95, 114-22) and on reconsideration (Tr. 96-110, 126-35), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 136-38). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 33-72.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 16-28.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-5, 14-15, 276-79), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] has not engaged in substantial gainful activity since November 8, 2012, the application date.
>
> 2. [Plaintiff] has the following severe impairments: bipolar disorder; panic disorder; borderline personality disorder; headaches; hypertension.
>
> . . .
>
> 3. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> . . .
>
> 4. . . . [Plaintiff] has the residual functional capacity to perform medium work . . . except [he] is only capable of occasionally climbing ropes, ladders, and scaffolds; working on simple, routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes; occasional

2

contact with supervisors and coworkers; but no work at a
fixed production rate of pace; he can work in proximity
with others but not in coordination with others; no
public contact.

. . .

5.   [Plaintiff] is unable to perform any past relevant
work.

. . .

9.   Considering [Plaintiff's] age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [he] can perform.

. . .

10.  [Plaintiff] has not been under a disability, as
defined in the [] Act, since November 8, 2012, the date
the application was filed.

(Tr. 21-28 (bold font and internal parenthetical citations

omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security

Commissioner's denial of social security benefits." Hines v.

Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope

of [the Court's] review of [such a] decision . . . is extremely

limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).

Plaintiff has not established entitlement to relief under the

extremely limited review standard.

3

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).  "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the

4

[Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a

---

[2] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

5

'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment,

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

the ALJ must assess the claimant's residual functional capacity ("RFC")." Id. at 179.[4]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled.  See id. at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d at 264-65.  If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  Hines, 453 F.3d at 567.[5]

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[5] A claimant thus can establish disability via two paths through the SEP.  The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

7

### B. Assignments of Error

Plaintiff contends that the Court should overturn the ALJ's finding of no disability on these grounds:

(1) the ALJ "erred in finding that [Plaintiff's] mental impairments d[id] not meet or medically equal Listings 12.04, 12.06, and 12.08" (Docket Entry 11 at 8 (capital letters omitted)); and

(2) the ALJ "erred in failing to accord appropriate weight to the opinion evidence in the record, including the opinion of [Plaintiff's] treating psychiatrist and the GAF scores throughout the record" (id. at 12 (capital letters omitted)).

Defendant disputes Plaintiff's assignments of error, and urges that substantial evidence supports the finding of no disability. (See Docket Entry 13 at 3-20.)

### 1. Listings 12.04, 12.06, and 12.08

In Plaintiff's first assignment of error, he contends that the ALJ "erred in finding that [Plaintiff's] mental impairments d[id] not meet or medically equal Listings 12.04, 12.06, and 12.08." (Docket Entry 11 at 8 (capital letters omitted).) More specifically, Plaintiff maintains that his bipolar disorder, evidencing both depressive and manic symptoms[,] . . . should result in [P]laintiff meeting and/or equaling the functional equivalent of the paragraph A criteria of Listing 12.04 [Affective Disorders]." (Id. at 9 (citing Tr. 286-88, 304-07, 310, 312-13,

327, 350, 356-57).) With regard to Listing 12.06 (Anxiety-Related Disorders), Plaintiff contends that his "panic disorder with agoraphobia . . . should result in [P]laintiff meeting and/or equaling the functional equivalent of the paragraph A criteria of Listing 12.06." (Id. at 10 (citing Tr. 290-94, 296-97, 304-07, 310, 312-13, 327, 350).) Plaintiff further maintains that his "borderline personality disorder . . . should result in [P]laintiff meeting and/or equaling the functional equivalent of the paragraph A criteria of Listing 12.08 [Personality Disorders]." (Id. (citing Tr. 304, 310, 312, 313, 327).) Moreover, Plaintiff argues that his testimony and treating psychiatrist's opinion establish that he suffers from "marked restriction in activities of daily living, extreme difficulty maintaining social functioning, and deficiencies in concentration, persistence, or pace" which "should result in [P]laintiff meeting and/or equaling the functional equivalent of [the paragraph B criteria of] Listings 12.04, 12.06, and 12.08." (Id. at 11 (citing Tr. 44, 48-49, 51, 56, 61, 351, 353).) Plaintiff's arguments fall short.

"Under Step 3, the [Social Security Administration's SEP] regulation states that a claimant will be found disabled if he or she has an impairment that 'meets or equals one of [the] listings in appendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the duration requirement.'" Radford v. Colvin, 734 F.3d 288, 293 (4th Cir. 2013) (quoting 20 C.F.R. § 404.1520(a)(4)(iii)) (internal

bracketed numbers omitted). "The listings set out at 20 CFR pt. 404, subpt. P, App. 1, are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (internal footnote and parentheticals omitted). "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing." Bennett, 917 F.2d at 160 (citing Zebley, 493 U.S. at 530, and 20 C.F.R. § 404.1526(a)); see also Zebley, 493 U.S. at 530 ("An impairment that manifests only some of those criteria [in a listing], no matter how severely, does not qualify."). To meet Listings 12.04 and 12.06, Plaintiff's mental impairments must satisfy either the criteria in paragraphs A and B, or the criteria in paragraph C, see 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06, and to meet Listing 12.08, Plaintiff must demonstrate that his personality disorder meets all of the requirements of paragraphs A and B of that listing, see 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.08.[6]

---

[6] The ALJ did not analyze whether Plaintiff's borderline personality disorder met or equaled Listing 12.08 but rather addressed Plaintiff's mental impairments under Listings 12.03 (Schizophrenic, Paranoid and Other Psychotic Disorders), 12.04, and 12.06. (See Tr. 21-22.) Plaintiff does not specifically assign error to the ALJ's decision to address Listing 12.03 rather than Listing 12.08, but instead argues that his personality disorder met and/or functionally equaled that Listing. (See Docket Entry 11 at 10.) In any event, the ALJ's failure to address Listing 12.08, if error at all, amounts to harmless error, because Listings 12.03 and 12.08 contain the same paragraph B criteria. Compare 20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 12.03B, with id. § 12.08B. Moreover, the (continued...)

Pursuant to Listings 12.04B, 12.06B, and 12.08B, Plaintiff must show that his mental impairments:

> B. Result[] in at least <u>two</u> of the following:
>
>> 1. <u>Marked</u> restriction of activities of daily living; or
>>
>> 2. <u>Marked</u> difficulties in maintaining social functioning; or
>>
>> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>>
>> 4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04B, 12.06B, 12.08B (emphasis added). In this context, to qualify as "marked," a limitation must "interfere seriously with [one's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(C); <u>see also</u> 20 C.F.R. § 416.920a(c)(4) (explaining that "marked" represents the fourth-highest of five levels, below "extreme," but above "none, mild, [and] moderate").

a. Activities of Daily Living

The ALJ cited specific record evidence to support her finding of <u>mild</u> limitation in activities of daily living:

---

[6] (...continued)
ALJ here apparently assumed, without explicitly finding, that Plaintiff's mental impairments satisfied the criteria of the "A paragraphs" of Listings 12.04 and 12.06. (<u>See</u> Tr. 21-22.) Further, Plaintiff does not challenge the ALJ's finding that Plaintiff's mental symptoms do not meet the criteria in the "C paragraphs" of Listings 12.04 and 12.06. (<u>See</u> Docket Entry 11 at 8-11; <u>see also</u> Tr. 22.) Accordingly, the relevant inquiry focuses on whether substantial evidence supports the ALJ's findings with respect to the "B paragraphs."

11

> In activities of daily living, [Plaintiff] has mild
> restriction. [Plaintiff] only has a mild restriction
> exhibited by his ability to perform domestic chores such
> as taking care of his children, cleaning, cooking, and
> getting his children prepared for school. [(Tr. 313.)]
> [Plaintiff's] fiancé also reported that [Plaintiff] helps
> feed and walk their dogs. [(Tr. 233.)]

(Tr. 22.)

Notably, Plaintiff does not dispute the accuracy of the evidence upon which the ALJ relied in finding mild limitation in activities of daily living. (See Docket Entry 11 at 11.) Instead, Plaintiff points to other record evidence (not expressly cited by the ALJ in connection with the step three analysis) as proof of a marked limitation in this area. (Id.) More specifically, Plaintiff points to (1) his "testi[mony] that he is often too depressed or fatigued to complete tasks around the house and that there are plates and trash piling up around his side of the bed that he's been too depressed to even touch" (id. (citing Tr. 51, 56, 61)); and (2) treating psychiatrist Dr. Connie Calvert's opinion that Plaintiff suffered from marked restriction in activities of daily living (id. (citing Tr. 351)).

Although the evidence Plaintiff cites arguably could have supported a finding of marked limitation in activities of daily living, none of that evidence compelled such a finding. First, the ALJ considered Plaintiff's hearing testimony and statements in medical records in a fair amount of detail (see Tr. 23-24), but ultimately found that Plaintiff's "statements concerning the

12

intensity, persistence and limiting effects of [his] symptoms
[we]re not entirely credible," noting that "many of [Plaintiff's]
symptoms are well-controlled with medications" and that Plaintiff
"ha[d] developed methods of dealing with his anger, such as
breathing, counting to 10, walking away, and avoiding stress" (Tr.
24). Plaintiff does not contest the ALJ's evaluation of his
subjective statements (see Docket Entry 11), and the ALJ cited to
substantial evidence to support her conclusions thereon.

Second, the ALJ discussed Dr. Calvert's opinions in a Medical
[S]tatement [C]oncerning [B]ipolar [D]isorder and [R]elated
[C]onditions for Social Security [D]isability [C]laim dated
December 30, 2014 ("MSS") (albeit not specifically Dr. Calvert's
opinion concerning Plaintiff's ability to engage in daily
activities) (see Tr. 25; see also Tr. 350-53), but accorded those
opinions "little weight" as "inconsistent with the medical record,
opinions from the other medical sources, and her own notes" (Tr.
25). For the reasons discussed in connection with Plaintiff's
second issue on review, the ALJ supported her decision to accord
little weight to Dr. Calvert's opinions with substantial evidence.

Accordingly, as the ALJ supported the mild limitation in
activities of daily living with substantial evidence, Plaintiff did
not contest the accuracy of the evidence upon which the ALJ relied,
and Plaintiff did not describe any evidence that compelled the ALJ

Case 1:16-cv-00498-WO-LPA    Document 14    Filed 07/25/17    Page 13 of 26

to find a marked limitation, Plaintiff has not shown entitlement to relief on this front.

b. Social Functioning

The ALJ provided the following supporting analysis for her finding of <u>moderate</u> limitation in social functioning:

> In social functioning, [Plaintiff] has moderate difficulties. [Plaintiff's] moderate restriction stems from the anxiety he feels around groups, for example [(Tr. 304)]. However, this is not more than a moderate restriction, as [Plaintiff] has shown that he can go to crowded events, like his daughter's open house, without needing to leave. [(Tr. 305.)] Additionally, [Plaintiff's] fiancé reported that [Plaintiff] only talks with others on the computer; otherwise, he spends his time with his fiancé and their children. [(Tr. 236.)]

(Tr. 22.)

Plaintiff does not contest the ALJ's reliance on the above-described evidence, but describes other evidence, <u>not</u> cited by the ALJ in the B paragraph analysis, that he claims supports a marked limitation in social functioning: (1) his "testi[mony] that his social anxiety has increased in the past couple of years, that he can barely get through occasional school functions for his children, that his wife does the shopping because he cannot handle being in the store, and that he cannot control anger outbursts that he has when he is around others" (Docket Entry 11 at 11 (citing Tr. 44, 48-49)); and (2) Dr. Calvert's opinion that Plaintiff's mental impairments cause extreme difficulty maintaining social functioning (<u>id.</u> (citing Tr. 351)).

14

As discussed in the preceding subsection, the ALJ considered Plaintiff's testimony and other statements about his social anxiety (see Tr. 23-24), but ultimately concluded that "[t]he allegations [Plaintiff] made when describing his symptoms [we]re not fully credible" (Tr. 24). Further, the ALJ addressed the opinions of Dr. Calvert (although not specifically Dr. Calvert's opinion regarding Plaintiff's social functioning ability) (see Tr. 25-26) and, as discussed in the context of Plaintiff's second issue on review, the ALJ supported with substantial evidence her decision to discount those opinions (see Tr. 25).

Thus, because the ALJ supported the moderate limitation in social functioning with substantial evidence, and Plaintiff neither contested that reasoning nor proffered evidence that required the ALJ to adopt a marked limitation, Plaintiff's attack on the ALJ's social functioning finding fails.[7]

In conclusion, Plaintiff's first assignment of error fails to warrant relief.

_____

[7] Plaintiff did not expressly assign error to the ALJ's findings that Plaintiff's mental impairments caused moderate limitation in concentration, persistence, or pace ("CPP"), and no episodes of decompensation. (See Docket Entry 11; see also Tr. 22.) Moreover, although Plaintiff mentioned Dr. Calvert's finding that Plaintiff experienced deficiencies in CPP (see Docket Entry 11 at 11; see also Tr. 351 (reflecting Dr. Calvert's encircling of the word "Present" with regard to deficiencies in CPP that result in "frequent failure to complete tasks in a timely manner")), Plaintiff made no attempt to show that the ALJ's finding of moderate limitation in CPP insufficiently encompassed Dr. Calvert's CPP opinion (see Docket Entry 11).

## 2. Opinion Evidence

In Plaintiff's second and final issue on review, he challenges the ALJ's evaluation of Dr. Calvert's opinions on the MSS and her Global Assessment of Functioning ("GAF") scores for Plaintiff. (See Docket Entry 11 at 12-15.)[8] Regarding Dr. Calvert's MSS, Plaintiff maintains that, "[a]s [P]laintiff's treating psychiatrist, Dr. Calvert is in the best position to determine how [P]laintiff's impairments affect his ability to work and her opinion should have been given the proper weight." (Docket Entry 11 at 14.) Plaintiff further asserts that the ALJ "erred in failing to adequately address the significance of [P]laintiff's [GAF] scores throughout the record" (id. at 14), most of which reflected either "impairment in reality testing or major impairment in several areas" or "serious symptoms" (id. at 15). According to Plaintiff, the ALJ "did not provide a sufficient explanation of her reasons for rejecting the GAF scores in the record." (Id.) Plaintiff's arguments fail as a matter of law.

a. Treating Psychiatrist's Opinion

Plaintiff first maintains that the ALJ erred by failing to accord the "proper weight" to Dr. Calvert's opinions on the MSS.

_____

[8] The GAF is a numeric scale from 0 to 100 representing a clinician's judgment of an individual's social, occupational and school functioning "on a hypothetical continuum of mental health-illness." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text revision 2000). A new edition of the leading treatise discontinued use of the GAF. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

(Id. at 14.) The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. 20 C.F.R. § 416.927(c)(2) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). The rule also recognizes, however, that not all treating sources or treating source opinions merit the same deference.

For example, the nature and extent of each treatment relationship may appreciably temper the weight an ALJ affords an opinion. 20 C.F.R. § 416.927(c)(2)(ii). Moreover, as subsections (2) through (4) of the rule describe in great detail, a treating source's opinion, like all medical opinions, deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record. 20 C.F.R. § 416.927(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590 (emphasis added).

Dr. Calvert opined on the MSS that Plaintiff had moderate impairment in his "ability to carry out very short and simple

17

instructions" (Tr. 351), "to make simple work-related decisions," "to ask simple questions or request assistance," and "to be aware of normal hazards and take appropriate precautions" (Tr. 352). Dr. Calvert assessed marked impairment of Plaintiff's "ability to remember locations and work-like procedures," "to understand and remember short and simple instructions," "to carry out detailed instructions" (Tr. 351), "to travel in unfamiliar places or use public transportation," and "to set realistic goals or make plans independently of others" (Tr. 352). Finally, Dr. Calvert rated as extremely impaired Plaintiff's "ability to understand and remember detailed instructions," "to maintain attention and concentration for extended periods," "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," "to sustain an ordinary routine without special supervision" (Tr. 351), "to work in coordination and proximity with others without being distracted by them," "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," "to interact appropriately with the general public," "to accept instructions and respond appropriately to criticism from supervisors," "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," "to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness," as

18

well as "to respond appropriately to changes in the work setting" (Tr. 352).

Here, the ALJ's evaluation of Dr. Calvert's opinion complied with the regulatory requirements. The ALJ discussed Dr. Calvert's opinions on the MSS (see Tr. 25), but accorded those opinions "little weight" for several reasons:

> Dr. Calvert's opinion is given little weight because it is inconsistent with the medical record, opinions from the other medical sources, and her own notes. In her earlier records Dr. Calvert's earlier reports that [Plaintiff] was doing well and had normal judgment, attention span, and concentration differs greatly from her opinion, for example, [(Tr. 327)]. In his meetings with Dr. Calvert, [Plaintiff] repeatedly reports experiencing situational stressors affecting his mood that would upset or cause sadness in anyone, regardless of mental impairment. Additionally, Dr. Calvert's opinion is given little weight because it does not account for [Plaintiff's] medication managing his symptoms. [Plaintiff's] wife noted that he was calmer and less irritable while on his medication. While off his medication, [Plaintiff] realized how effective the medication was at preventing the mood swings he currently experienced while off the medication. While Dr. Calvert's opinion deserves some weight due to her being [Plaintiff's] treating physician, she only receives little weight because her opinion is inconsistent with the medical record and fails to account for the beneficial effects of [Plaintiff's] medication.

(Tr. 25-26 (internal citations omitted) (emphasis added).)

As an initial matter, in attacking the ALJ's decision to accord "little weight" to Dr. Calvert's opinions, Plaintiff does not address the ALJ's rationales, which find support in the record (see Tr. 84-94, 96-109, 290-96, 304-13, 327), that Dr. Calvert's opinions (1) are "inconsistent with the medical record" (Tr. 25)

19

(2) are "inconsistent with . . . her own notes" (id.); and (3) did "not account for [Plaintiff's] medication managing his symptoms" (Tr. 26). (See Docket Entry 11 at 12-15.) Rather, Plaintiff focuses on the ALJ's finding that Dr. Calvert's opinions did not harmonize with "opinions from the other medical sources" (Tr. 25), arguing that "the only relevant opinion would be that of [state agency psychological consultant] Dr. Jonathan Mayhew, a non-examining physician who rendered his opinion . . . without benefit of the full record." (Docket Entry 11 at 13.)

Plaintiff's argument misses the mark. Although the ALJ did not explicitly discuss the state agency psychological consultant's findings at the initial level of review (see Tr. 24-25), that consultant, Dr. Nancy Y. Herrera, offered opinions as to Plaintiff's mental RFC nearly identical to those of Dr. Mayhew. (Compare Tr. 91-2, with Tr. 105-07.) Notably, both consultants opined that Plaintiff retained the ability to "maintain attention and concentration up to 2 hours at a time as required for the performance of simple tasks . . . in settings with minimal social demands . . . [and] within the context of a stable, low-stress work assignment." (Tr. 92, 105, 107.) The consultants' opinions thus offer restrictions much less extreme than Dr. Calvert's. (Compare Tr. 92, 105, 107, with, Tr. 351-52.) Consistent with the consultants' opinions, the ALJ adopted a mental RFC which included restrictions to "simple, routine tasks involving no more than

20

simple, short instructions and simple work-related decisions with few work place changes; occasional contact with supervisors and coworkers; but no work at a fixed production rate or pace; . . . work in proximity to others but not in coordination with others; [and] no public contact." (Tr. 23.)

Moreover, ALJs can permissibly credit the opinions of non-examining physicians, who render their opinions without the benefit of a full record, over those of a treating physician, where the non-examining physicians's opinions remain consistent with the evidence received subsequent to their opinions. See Lapeer v. Astrue, No. 5:08-CV-256-D(1), 2009 WL 2487038, at *7 (E.D.N.C. Aug. 13, 2009) (unpublished) (noting that, "under appropriate circumstances, where the opinion of the treating source is not given controlling weight, a nonexamining source opinion may be accorded substantial weight and even more weight than a treating source opinion" (citing 20 C.F.R. § 416.927(d), and Social Security Ruling 96-6p, Policy Interpretation Ruling Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence, 1996 WL 374180, at *3 (July 2, 1996))). Here, the ALJ expressly stated that she gave the consultants' opinions "great weight" in part because she found their opinions "consistent with the treatment

record." (Tr. 25.) That explanation suffices. See Dear v. Astrue, No. 4:10-CV-95-D, 2011 WL 4381742, at *5 (E.D.N.C. Sept. 20, 2011) (unpublished) (holding that "ALJ lawfully gave the opinions [of non-examining state agency consultants] greater weight [than the opinion of a treating source] because, as the ALJ found after summarizing these opinions, they "are consistent with the longitudinal medical record").

In sum, the ALJ here explained her decision to give Dr. Calvert's opinions little weight, and supported that explanation with substantial evidence.

b. GAF Scores

Plaintiff further argues that the ALJ "erred in failing to adequately address the significance of [P]laintiff's [GAF] scores throughout the record," most of which reflected either "impairment in reality testing or major impairment in several areas" or "serious symptoms." (Docket Entry 11 at 15.) In particular, Plaintiff faults the ALJ's evaluation of the GAF scores on three bases: (1) Plaintiff received multiple GAF scores in the 40 to 50 range between September 2012 and December 2014, such that the scores do not represent a mere "snapshot" of Plaintiff's functioning; (2) the ALJ misstated the moderate range of GAF scores as "50 or higher" (Tr. 26) and overstated the number of GAF scores in the moderate range; and (3) the ALJ inaccurately stated that Plaintiff's lower GAF scores correlate with periods of medication

22

noncompliance.  (See Docket Entry 11 at 14-15.)  None of those grounds provides a basis for remand or reversal.

Effective July 22, 2013, the Social Security Administration clarified its position on the relevance of GAF scores as follows:

> [W]hen it comes from an acceptable medical source, a GAF rating is a medical opinion . . . .  An [ALJ] considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by [20 C.F.R. § 416.927(c)] . . . .  [A] GAF needs supporting evidence to be given much weight.  By itself, the GAF cannot be used to 'raise' or 'lower' someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning.  Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

Administrative Message 13066, <u>Global Assessment of Functioning (GAF) Evidence in Disability Adjudication</u> ("AM-13066").

Consistent with the foregoing policy, the ALJ explicitly discussed and assigned weight to the GAF scores of record:

> [Plaintiff] has had a number of [GAF] scores taken between 2012 and 2014.  GAF scores rate the social, occupational, and psychological functioning of adults on a 0 to 100 scale.  A score of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, 41-50 indicates serious symptoms, and 51-60 indicates only moderate symptoms. The record indicates that [Plaintiff] has had 11 GAF scores taken between September 4, 2012, and December 30, 2014, with scores ranging from 40 to 55.  <u>These scores are given little weight, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th ed. (DSM-IV), they only represent a "snapshot" judgment of [Plaintiff's] level of symptoms on the day of examination</u>.  Moreover, according to the DSM-IV, <u>absent an independent explanation from the assessing examiner,</u>

23

> GAF scores should be interpreted as representing the
> lower of [Plaintiff's] symptoms or level of functioning.
> This dichotomy recognizes that some symptomatic
> individuals may nevertheless be high functioning.
> Finally, [Plaintiff] has had a number of GAF scores that
> are 50 or higher, indicating that with proper medication
> he can function with only moderate symptoms.
> [Plaintiff's] high level of functioning is exhibited by
> his relationship with his daughters; for example,
> [Plaintiff] goes to their open house meetings, takes them
> to the pool, and brings them to the fair as well as
> acting as their primary caretaker on a daily basis.
> Additionally, [Plaintiff's] lower GAF scores correspond
> to times when [Plaintiff] was not compliant with his
> medications.

(Tr. 26 (internal citation omitted) (emphasis added).)

First, regardless of the quantity of GAF scores Plaintiff has received, a GAF score still reflects only "a snapshot of a person's functioning at a particular point in time, and is not a longitudinal indicator of the person's functioning." Riddick v. Colvin, No. 2:12-cv-34, 2013 WL 1192960, at *5 (E.D. Va. Feb. 28, 2013) (unpublished) (emphasis added).

Second, the ALJ did not overstate the number of moderate GAF scores Plaintiff received. The ALJ first expressly stated that Plaintiff "has had 11 GAF scores taken between September 4, 2012, and December 30, 2014, with scores ranging from 40 to 55," and then noted that Plaintiff "has had a number of GAF scores that are 50 or higher." (Tr. 26 (emphasis added).) Given that the ALJ expressly quantified the total number of GAF scores in the record, the ALJ

24

clearly knew how many of those scores qualified as 50 or higher.[9] The record reflects that three of the 11 GAF scores ranked in the 51 to 60 range (see Tr. 296, 306, 307), and Plaintiff has not shown why the ALJ's reference to a "number" of moderate GAF scores "overstates" that three out of eleven of such scores fell in the moderate range.

Finally, Plaintiff faults the ALJ for concluding that Plaintiff's lowest GAF scores coincide with periods of medication noncompliance (see Tr. 26), noting that "[t]he ALJ supported th[at] conclusory statement with just a single score that was assessed during a period when [P]laintiff was unable to afford his medication and did not take it for a few days" (Docket Entry 11 at 15 (citing Tr. 312)). Even if the ALJ erred in that regard, Plaintiff has failed to show prejudice.

As quoted above, the ALJ gave another reason for discounting the GAF scores (see Tr. 26 (noting that, "<u>absent an independent explanation from the assessing examiner, GAF scores should be interpreted as representing the lower of [Plaintiff's] symptoms or level of functioning</u>" as well as that Plaintiff's "high level of functioning is exhibited by his relationship with his daughters;

_____

[9] The ALJ mistakenly expressed the moderate range of GAF scores as "50 or higher." (Tr. 26.) The DSM-IV categorizes moderate symptoms with GAF scores from <u>51</u> to 60. <u>See</u> DSM-IV at 34. That error, however, qualifies as harmless under the circumstances, as Plaintiff received only one GAF score of 50 (<u>see</u> Tr. 305) and thus, the ALJ, at most, misconstrued <u>one</u> GAF score as being in the moderate range as opposed to the highest functioning end of the serious range.

25

for example, [Plaintiff] goes to their open house meetings, takes them to the pool, and brings them to the fair as well as acting as their primary caretaker on a daily basis"), <u>and</u> Plaintiff has not specifically attacked that reason (<u>see</u> Docket Entry 11 at 12-15).[10]

In short, Plaintiff's claim that the ALJ improperly evaluated Dr. Calvert's opinions and GAF scores fails as a matter of law.

### III. CONCLUSION

Plaintiff has not established an error warranting reversal or remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 10) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 12) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

July 25, 2017

---

[10] Additionally, because the GAF scores reflect Dr. Calvert's opinions, the ALJ's discounting of Dr. Calvert's opinions (which, as discussed above, the ALJ did appropriately) also precludes a finding of prejudice.

Case 1:16-cv-00498-WO-LPA   Document 14   Filed 07/25/17   Page 26 of 26